UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **GENE P. BONVILLAIN, in his capacity** | * | **Civ. No. 09-3540** |
| **as ASSESSOR for the PARISH OF** | * | **and other consolidated cases** |
| **TERREBONNE, STATE OF LOUISIANA,** | * | |
| | * | **RE: No. 09-3540** |
| **Plaintiff,** | * | |
| | * | |
| **vs.** | * | |
| | * | |
| **LOUISIANA LAND & EXPLORATION** | * | |
| **CO., an entity organized under the laws of** | * | |
| **a state other than Louisiana and a wholly** | * | **Sect. C Mag. 2** |
| **owned subsidiary of CONOCOPHILLIPS,** | * | |
| **a Delaware Corporation, and DONNA K.** | * | **Judge Berrigan** |
| **LAURENCE, and NANCY DEPAUL,** | * | |
| | * | **Magistrate Judge Wilkinson** |
| **Defendants.** | * | |

---

## FIRST AMENDED COMPLAINT

---

NOW COME the Plaintiff, GENE P. BONVILLAIN, in his capacity as Assessor

for the Parish of Terrebonne, State of Louisiana, through counsel, and for this, his complaint

for damages and other relief, would state and show as follows:

1

## PARTIES AND JURISDICTION

1.      Plaintiff Gene B. Bonvillain ("Bonvillain") is the Assessor of the Parish of Terrebonne, a subordinate local governmental entity of the State of Louisiana.

2.      Defendant Louisiana Land & Exploration Company ("LL&E") is an entity organized and having its principal place of business in a state other than Louisiana.  LL&E is a wholly owned subsidiary of ConocoPhillips, a Delaware corporation having its principal place of business in Texas.

3.      This is an action for fraud and for the recovery of delinquent and unpaid taxes and for damages in an amount that far exceeds the jurisdictional minimum amount in controversy that confers jurisdiction on this Court.

4.      Jurisdiction is conferred on this Court by virtue of 28 U.S.C. §§ 1332 and 1367(a).

5.      A substantial part of the events or omissions giving rise to the claim occurred in this district, and a substantial part of property that is the subject of the action is situated in this district.

## GENERAL FACTUAL ALLEGATIONS

6.      Terrebonne Parish is one of the coastal parishes of Louisiana, located on the Gulf of Mexico ("the Gulf").  Below the surface of the Gulf and within the coastal lowlands immediately adjacent to the Gulf are located some of the major producing oil and gas fields in the United States.  These oil and gas fields in some cases extend into the Gulf far from the

2

coastal boundary of the State of Louisiana.  For the purposes hereof, the oil and gas fields to which the allegations of this complaint relate are limited to the fields within the jurisdiction of the State of Louisiana, extending from the Gulf Coast of Louisiana, encompassing the areas immediately adjacent thereto ("the Inshore Fields"), to the limit of its jurisdiction, three miles offshore ("the Offshore Fields").  The Inshore and Offshore Fields, taken together, are mature fields, meaning that the fields have been extensively developed and minerals have been extracted from them for many years and even decades.

7.      The minerals and natural gas within the Inshore and Offshore Fields are exploited by a number of oil and gas production, exploration, and drilling companies, one of which is LL&E.  Each of the Inshore and Offshore Fields, depending upon its respective location, is within the jurisdiction of one of the several coastal parishes, such as Terrebonne Parish.  There are approximately 1,546 oil and gas wells and other production facilities within, inshore, or offshore from Terrebonne Parish, many of which are within the Inshore or Offshore Fields.  LL&E has approximately 147 wells and three production facilities within Terrebonne Parish.

8.      The extraction of minerals and gas from the Inshore and Offshore Fields requires the use of complex and costly equipment.  A well must be drilled to access the minerals below the surface, the minerals (oil and gas) must be brought to the surface (sometimes requiring the application of artificial pressure), and then the minerals must be

transported via either pipeline (called a "fee line") or by barge to a production facility, from which the minerals then are transported to onshore refineries or finishing plants.

9.      LL&E and the other oil and gas production companies, having installed the necessary equipment, must continuously monitor and do monitor the flow of minerals through the system hereinbefore described.

10.      The oil and gas production companies, including LL&E, are required by law to pay to the State of Louisiana severance taxes on all minerals and gas extracted and removed from Louisiana, including from the Inshore and Offshore Fields.  The Louisiana severance taxes are paid based on the volume of minerals and gas that pass through the valves which measure, meter, and control the flow of minerals.  The oil and gas production companies periodically and regularly report the volume of minerals and gas that flow through the metering devices to the Louisiana Department of Natural Resources for purposes of assessing the amount of severance tax due and owing by each taxpayer to the State of Louisiana for a particular time period.

11.      Until approximately 1998, the regulatory policy of the Louisiana Tax Commission required that the oil and gas companies report the production of the wells in the Inshore and Offshore Fields on a well-by-well basis.  That is to say, the output for each well for each reporting period was measured and reported by the operator of that particular well to the Louisiana Department of Natural Resources.

12.     At the urging and insistence of the oil and gas production companies and the trade association representing the independent production companies, then known as the Louisiana Independent Oil & Gas Association ("LIOGA"), the Louisiana Tax Commission was persuaded in 1998 or thereabouts to change its policy regarding the measurement and reporting of oil and gas production from the Inshore and Offshore Fields for purposes of determining the amount of severance tax due on the production for each period.  Instead of reporting production well by well, individually, as they had done previously, each operator of the wells in a particular field (which may and typically do contain many wells) instead filed a "unitary report," which consolidated the reporting of the production of all wells within that field.

13.     Under this form of unitary reporting, there was no way to determine whether the reported production from a particular field was comprised of the production from all, some, or only one well within that field.  Instead, the operator of the wells in a particular field reported only the gross production from all wells which were producing in that field.  Those wells that have current production are termed "producing wells."  Those wells that have no current production are said to be "shut in."  Wells that have a low output of less than 10 barrels of oil or 100 Mcf (100,000,000 cubic feet) of natural gas per day are termed "stripper wells."

14.     By statute, all nonexempt movable and immovable property in Louisiana is subject to the payment of ad valorem taxes to the parish in which the property is located by

the owners of that property.  These taxes are collected by the several parishes in Louisiana as general revenue for application to those public purposes determined by the governing authorities of the parishes.  These taxes represent a substantial source of revenue for the parishes.

15.     The constitutional authority and responsibility for the assessment of ad valorem taxes is vested in the office of the parish assessor.  That Assessor for the Parish of Terrebonne is Plaintiff Bonvillain.

16.     The assessment of ad valorem taxes is premised in the first instance on the fair market value of the property being assessed.  The fair market value of property being assessed for tax purposes is reduced by a ratable amount or percentage of the fair market value, the result of which then becomes the assessed value of the property in question.  The rate or percentage applied and used to determine the assessed value of property is established by an equalized schedule approved by the Louisiana Tax Commission.  These various percentages are applied ratably, depending on the type of property and its location.

17.     In general, the valuation of property, hence the basis for the assessed tax owed on property located on dry land, can be and often is determined upon visual inspection by officers designated for the purpose by the assessor.

18.     Visual inspection by the assessors of movable property located inshore or offshore is generally not feasible, since the assessors have neither the manpower nor the resources to conduct visual inspections of the thousands of wells and other facilities located

6

in the Inshore and Offshore Fields.  Accordingly, the Louisiana Tax Commission has adopted a system of self-reporting.  The assessed value of oil and gas property, including that property used to produce oil and gas from the Inshore and Offshore Fields, is determined solely on the basis of reports filed under oath by the affected oil-and-gas-producing companies that own and operate that equipment.  The taxpayers report the value of their equipment and other movable property, hence their exposure to liability for payment of ad valorem tax, on a form designated by the Tax Commission as a "LAT12 form."

19.     Various categories of equipment are reported on particular kinds of LAT12 forms.  For example, certain meters are to be reported on Form LAT12-2, whereas a lease line is to be reported on Form LAT12-4.  It is the duty and obligation of the taxpayer to report the quantities and types of machinery and equipment used in the production and transmission of oil and gas on the appropriate and correct LAT12 form, since it is on the basis of the reporting that the percentage rate of taxation or "millage" is calculated.  In addition to all of the other false and materially misleading reporting of property subject to taxation hereinafter alleged to have been committed by LL&E, LL&E misleadingly and confusingly failed to report or incorrectly reported property subject to taxation on incorrect LAT12 forms.

20.     The LAT12 forms are filed under oath by the affected taxpayers annually with the office of the assessor for the parish in which the taxable property is located.  One LAT12

form, or a group of related LAT12 forms, is filed for each oil and gas field that the taxpayer operates within the Inshore and Offshore Fields.

21.   The LAT12 form provides detail whereby each item of the equipment used on each well or production facility, or to connect each well to a production facility, within a given field is (or should be) identified and reported.  Each well within that field is (or should be) characterized as "producing," "shut in," or "stripper," as hereinbefore described.

22.   The ad valorem tax owed on equipment used to produce and distribute oil and gas from the Inshore and Offshore Fields is determined as follows.  Each item of property is valued at its fair market value when acquired new at the time that particular item was placed in service.  The fair market value of all oil-and-gas-producing facilities in Louisiana is reduced by a uniform percentage of 40%, then reduced by a further 15%, to determine the assessed value of the property.  The assessed value of the property is multiplied by a millage rate to determine the amount of the tax owed for that item of property.  Furthermore, for each year that the item of movable property remains in service, its assessed value is reduced by a uniform percentage amount to account for depreciation.

23.   Equipment and machinery used to produce oil and gas in the Inshore and Offshore Fields typically have a useful life of many years.  The acquisition and installation costs of that equipment are very high, providing an incentive for the operator to maintain and repair it rather than to replace it.  Unless a floor were established for the assessed value of the depreciated property for the years it remains in service, eventually the fully depreciated

value of the taxable property would be zero, hence its assessed value would be zero, and no tax would be assessed and paid for that particular item for that tax year and for all succeeding tax years, even though the item remains in service contributing to the production of the well or production facility with which it is associated.

24.     Until 2005, as hereinafter alleged, the floor below which the value of the property in question could not be depreciated was 30% of its original assessed value.  In other words, when a particular item of property was depreciated fully to 30% of its assessed value, the value of that item could not be depreciated further.

25.     The foregoing scheme for determining the assessed value of property used in the Inshore and Offshore Fields applies only to wells that are characterized as "producing." If a well is characterized as a "stripper" well, then the property associated with that well is taxed based on a uniform rate of 60% of its assessed value.  If the well is characterized as "shut in," then the property associated with that well is taxed based on a uniform rate of 10% of its assessed value.  Some wells that have been shut in for a lengthy period of time are characterized as having "no further utility" ("NFU"), and those wells are not taxed at all.

26.     During late 2004 and early 2005, the oil and gas production companies in Louisiana, through or in concert with LIOGA, urged the Louisiana Tax Commission to reduce the floor for depreciation from 30% to 20%.  This proposal was vigorously opposed by Plaintiff Bonvillain, since the self-evident result of reducing the depreciation floor would be to lower the assessed value of a substantial percentage of the oilfield equipment (in many

cases now fully depreciated) that otherwise would have been taxed based on the higher depreciation floor of 30%.

27.    In an effort to persuade the Tax Commission of the merits of its position, LIOGA commissioned a report by Affiliated Tax Consultants ("the ATC Report").  One of the authors of the ATC Report, in a cover letter transmitting a copy of the report to Plaintiff Bonvillain, stated that "[t]here was no information provided directly by any operator.  The data was taken from one source, the [Louisiana] Department of Natural Resources web site."

28.    In reliance on the results of the ATC Report, which was filed with and accepted by the Tax Commission, the Tax Commission by regulation reduced the depreciation floor from 30% to 20%, as urged by LIOGA and the oil production companies, despite the opposition of Plaintiff Bonvillain and the other assessors in the affected parishes.  The ATC Report was false and fraudulent in a number of material respects, all to the advantage of the oil production companies.

29.    As a result of his preliminary investigation, Bonvillain discovered that LL&E and certain of the other oil production companies operating inshore and offshore in Terrebonne Parish were fraudulently and falsely underreporting their ad valorem tax liability. LL&E and certain other of the operators in the parish did so in three material ways:  (1) underreporting the value of some of their taxable property; (2) failing to report at all other items of their taxable property; and (3) falsely reporting producing wells as being either shut in or stripper wells.

30.     In an effort to determine the true and accurate ad valorem tax liability owed by LL&E and the other oil production companies operating in Terrebonne Parish, Bonvillain commissioned a comprehensive study of the operations of those companies from Visual Lease Services, Inc., of Holdenville, Oklahoma, one of the leading oil field consultants in the United States (the "VLS Study").  The VLS Study involved physical inspection of all 1,546 wells and all production facilities located within Terrebonne Parish during 2008 and 2009. The VLS Study has thus far uncovered vast and pervasive underreporting and false reporting of tax liability by LL&E and certain of the other oil production companies.

31.     Terrebonne Parish paid $500,000 in fees to VLS to undertake the VLS Study, which was conducted over a period of many months during 2008 and 2009.

32.     As one component of the VLS Study, VLS personnel made direct visual inspection of all wells, production facilities, and other oil and gas equipment used by LL&E and each of the other oil and gas companies doing business in Terrebonne Parish.  In other words, VLS personnel went to each and every well and production facility, including those owned and operated by LL&E, disembarked, and physically inspected each and every item of equipment thereon.  In the course of its inspections, VLS took photographs of the many wells and production facilities and conducted an inventory of all movable property.  That inventory included recording the serial numbers, dates of purchase, and acquisition costs of each and every item of equipment located inshore and offshore of Terrebonne Parish.

33.     VLS also located each well by global positioning coordinates so that its location could be precisely determined on maps that were created for the Assessor's office.

34.     Based upon its lengthy and painstaking study of all of the information gathered in its inspection, VLS determined the depreciated value on a replacement-cost-new-less-depreciation basis (as determined in accordance with the required Louisiana Rules and Regulations, Less Depreciation ("LaRRLD") valuation method) of each and every item of equipment owned and operated by the oil-and-gas-producing companies, including LL&E, within Terrebonne Parish.  VLS then compared the depreciated value of the actual items of movable property it found on the wells and production facilities with the value rendered on the LAT12 forms filed with the Assessor's office by the taxpayers, including LL&E.

35.     As reported in the VLS Study, the comparison by VLS of (a) the items and their values rendered by the oil and gas companies on their LAT12 self-reporting forms to (b) the movable property actually documented by VLS in its physical inspection of the wells and production facilities demonstrated that the oil and gas companies, including LL&E, had systematically underreported the value of their taxable property, falsely reported the status of the wells on which their property was located, and even failed to report at all many items of their taxable property.

36.     Although the VLS Study was conducted in 2008 and 2009, VLS, the Assessor's office, and other professionals acting on behalf of the Assessor examined LAT12 forms, titles, and other records going back for years to establish that the pattern of misreporting and

nonreporting had been ongoing for up to 10 years.  Based on the dates of purchase and the condition of the equipment that was visually inspected, much of which had the appearance of having been in use for a number of years, it can reasonably be inferred that equipment found on the wells and production facilities in 2008 and 2009 had been in service in prior years but had been underreported, falsely reported, or nonreported on the LAT12 forms filed for those earlier years as well.

37.     It is also reasonable to infer that LL&E and the other oil and gas companies knowingly falsified the LAT12 self-reporting forms they filed with the Assessor's office.  It lacks credence that the oil and gas companies would have committed an innocent mistake, for up to 10 years running, in simply forgetting to report at all millions of dollars' worth of equipment, some of it the size of a pickup truck.  Even more damning is the oil and gas companies' systematic underreporting of the depreciated value of many thousands of items of their movable property, despite the availability to the companies of the same information used by VLS to determine the true value of that property, including the identity of the items, their dates of purchase and acquisition costs, and the uniform LaRRLD valuation method. Armed with that information, it simply defies reason to believe that each of the oil and gas companies innocently committed nothing more than thousands of mathematical errors in miscalculating the value of their taxable property.  Simple mathematical error is also not available as an excuse for falsely reporting the status of a producing well as either a shut in or stripper well.

38.     That portion of the VLS Study related to the inspection of facilities belonging to LL&E in 2008-2009 is filed herewith and identified as Exhibit A-1 of this complaint, as directed by the Court in its Order and Reasons of March 29, 2010.  (Exhibit A-1 exceeds in size the 5-megabyte limit adopted by the Court for electronic filing pursuant to Loc. R. 5.07.01.  Accordingly, it is filed herewith as a manual attachment in the form of a computer diskette.)

39.      Exhibit A-1 shows every item of taxable property documented by VLS upon its physical inspection of LL&E's facilities, as well as the actual depreciated value of that item, as determined by VLS, the value reported (or not reported, in many cases) by LL&E, and the tax liability avoided by LL&E (as calculated in a report prepared by accounting firm LaPorte, Sehrt, Romig & Hand, which is also part of Exhibit A-1), as to those items that were falsely reported.

40.     There are far too many items of property falsely reported by LL&E, all of which are shown in Exhibit A-1, to document them all in the body of this complaint and still comply with the "short and plain statement" pleading requirement of Fed. R. Civ. P. 8(a)(2). Here are some examples, by dollar amount, of LL&E's false reporting:

14

| Serial Number | Description | Depreciated Value | Rendered Value | Tax Savings |
|---|---|---|---|---|
| 224414 | Well, Gas, Region 2, 15000-17499' per FT - VUA;LL&E FEE 7 | $439,593 | $264,440 | $16,424 |
| 235521 | Well, Gas, Region 2, 15000-17499' per FT - SL 301 TERREBONNE BAY 398 | $674,990 | $300,000 | $38,196 |
| 226018 | Pipe, Offshore Line, 6" Steel, per FT - VUC;SL 17038 001 | $162,470 | $13,700 | $13,950 |
| | | | | |
| | | | Example Total: | $68,571 |

41.    All of the items listed in ¶ 40 were falsely reported by LL&E in the LAT12 forms executed on its behalf by its agents and submitted to the Assessor's office.

42.    By way of illustration of the nature of property that was not reported by LL&E are photographic images taken in 2008-2009 of property omitted from reporting by LL&E, which images were included in the complaint, and by this reference they are made a part hereof.   Also reproduced were images taken in 2009 of well serial number 221795 that was reported by LL&E as being shut in when, in fact, that well was producing during that same period of time, which images by this reference are made a part hereof.

43.    In particular, the fair market value on a replacement-cost-new-less-depreciation basis, using the LaRRLD method, of much of the property that was reported by LL&E as being in service in the Inshore and Offshore Fields in 2008 was underreported by a substantial amount. For example, in the Inshore Field known as Caillou Island (comprised of 128 wells), the operator reported nonexempt property having a depreciated value of

$26,434,080 when in fact that same property at that location had an actual depreciated value of $50,474,371.

44.     In the inshore field known as Caillou Island, the VLS Study identified property having a fully depreciated value of $3,560,515.94 that had not been reported by the operator at all for the tax years 1998-2008, inclusive.  Some property owned by LL&E and that was in service at the Inshore Field known as Four Isle Dome during the tax years 1998-2008 was not reported at all.  The VLS Study identified property having a fully depreciated value of $12,495,764.23 that had not been reported by the operator at all for the tax years 1998-2008, inclusive.  In the Inshore Field known as Pass Des Ilettes, the VLS Study identified property having a fully depreciated value of $76,268,738.98 that had not been reported by the operator at all for the tax years 1998-2008, inclusive.  In the Inshore Field known as Pass Wilson, the VLS Study identified property having a fully depreciated value of $6,541,875.73 that had not been reported by the operator at all for the tax years 1998-2008, inclusive.

45.     In addition, LL&E reported wells as being shut in, when in fact those wells were producing.  For example and by way of illustration, the well at Four Isle Dome identified as well serial number 22175 was reported to the Assessor of Terrebonne Parish as being shut in in 2006 and 2007, while for the same period that same well was reported elsewhere and for purposes of paying severance tax as being producing, thus reducing materially the amount of ad valorem tax that should have been paid with respect to the equipment used for that well.  The well continues to be producing. Reproduced in the

original complaint in this matter are images taken in 2009 of well serial number 22175 that was reported by LL&E as being shut in when in fact that well was producing during that same period, and by this reference they are made a part hereof.  All such wells are identified in Exhibit A-1.

46.     The cumulative effect of the false, fraudulent, and materially misleading underreporting, nonreporting, and misreporting of taxable property by LL&E to the Assessor of Terrebonne Parish is for LL&E and certain other of the other oil and gas production companies operating in Terrebonne Parish to have underpaid the ad valorem tax due by many millions of dollars.

47.     As a direct and proximate consequence of the false, materially misleading, and fraudulent reporting by LL&E of its property for ad valorem tax purposes, LL&E was assessed by Plaintiff Bonvillain for the tax owed in an amount far below that for which it would have been assessed but for the misreporting and nonreporting of its property hereinbefore alleged.

48.     As a result of the diminished or reduced assessment of its property eligible for ad valorem taxation, Terrebonne Parish collected much lower tax from LL&E than LL&E lawfully owed for the 10 years next preceding the filing date of this complaint, and perhaps longer, all to the substantial injury of Terrebonne Parish.

49.     At no time prior to the date hereof has Defendant filed a revised, amended, or corrected LAT12 for any of the tax years material hereto.

## COUNT I:  RECOVERY OF DELINQUENT TAXES

50.     The allegations of ¶¶ 1-49 are realleged as if repeated verbatim.

51.     At all times material to the allegations of this complaint, Plaintiff Bonvillain was, and still is, the duly qualified, elected, and acting Assessor of Terrebonne Parish, Louisiana, having the authority under LSA-R.S. §§ 47:5 and 47:1903 to assess for collection lawful taxes for Terrebonne Parish, Louisiana.

52.     At all times material to the allegations of this complaint, Vernon Bourgeois was, and still is, the duly qualified, elected, and acting Sheriff of Terrebonne Parish, Louisiana, having the authority under LSA-R.S. §§ 47:5 and 47:1903 to collect taxes after they are properly and legally assessed by the Plaintiff Bonvillain for Terrebonne Parish, Louisiana. The Sheriff can collect said taxes only after they have been lawfully assessed by Plaintiff Bonvillain. This complaint alleges a fraudulent scheme by this Defendant which is not contemplated by the laws of Louisiana governing assessments. Therefore, the Assessor is the only necessary party to bring this claim in an attempt to determine the extent of the fraudulent avoidance of taxes by Defendant, that are legally owed to the people of Terrebonne Parish. Then and only then, when the extent of avoidance is judicially determined can the Sheriff collect the taxes.

53.     At all times material to the allegations of this complaint, LL&E owned movable property for the production of oil and gas located within the taxing jurisdiction of Terrebonne Parish.

54.     Plaintiff Bonvillain or his predecessor in office caused to be placed on the assessment rolls of Terrebonne Parish movable property and assessed the property for purposes of taxation pursuant to the LAT12 self-reporting forms submitted under oath by LL&E for the tax years 1998 through 2008, inclusive. Attached to the original complaint filed in this matter and marked Collective Exhibit A, and by this reference made a part hereof, was a LAT12 Form or Forms for the year 2008, which is illustrative of each and all other LAT12 Forms submitted by or on behalf of LL&E for the years at issue.

55.     The LAT12 self-reporting tax forms, as hereinbefore alleged, require the taxpayer to report under oath fully, completely, and accurately all movable oil and gas production property that is subject to tax and that is owned by the taxpayer and the true and accurate assessed value thereof.

56.     Subsequently, and based on the foregoing self-reporting assessments by LL&E, Plaintiff Bonvillain levied taxes against Defendant's property for the years 1998 through 2008, inclusive.   In accordance with his customary practice, from and after about March 1 of each succeeding year, Terrebonne Parish through the Sheriff sent a written tax bill for the taxes to LL&E.  Each bill included a demand that LL&E pay the taxes specified therein on or before a stipulated date of the current tax year and of each succeeding year through 2008 inclusive.

57.     Not until after an investigation was recently initiated was it determined by Plaintiffs that LL&E has been falsely and fraudulently underreporting, misreporting, or

failing to report the ownership of movable property and/or the assessed value of property within Terrebonne Parish subject to the assessment and payment of ad valorem taxes having a value far in excess of the assessed value reported to Terrebonne Parish for at least the years 1998 through 2008, inclusive, and beginning perhaps earlier.   While investigation to determine the amount of tax owed by Defendant LL&E remains ongoing, Plaintiffs have thus far determined that Defendant LL&E has evaded payment of ad valorem taxes in an amount of not less than $950,222, exclusive of interest, penalties, and costs of collection.

58.     In addition to any and all other remedies available to Plaintiffs, Defendant shall be liable for payment of penalties as provided for in LSA-R.S. § 47:2330 for having willfully underreported its tax liability as hereinbefore alleged.

59.     LL&E's failure to pay the taxes of at least $950,222, or such other amount as may be determined upon further investigation, caused Defendant to become indebted to Terrebonne Parish for a penalty fee, plus interest until the tax is paid.

WHEREFORE, Plaintiffs demand that judgment be entered in his favor and against LL&E on Count I and that Plaintiffs be awarded the following:

a.     The amount of tax due in the amount of not less than $950,222, or such other amount as investigation may determine, with interest on that amount as allowed by LSA-C.C.P. art. 1921, from and after 1998 to the date of judgment in this action;

b.     A penalty fee in an amount to be determined upon a trial of this cause;

c.      Costs of this action; and

d.      Such other and further relief as the Court deems just and proper.

## COUNT II:  FRAUD

60.     The allegations of ¶¶ 1-59 are realleged as if repeated verbatim.

61.     From and after about 1998 and continuing until the present, LL&E was doing business and owned taxable property in Terrebonne Parish, rendering it liable for the payment of ad valorem taxes to Terrebonne Parish, as alleged hereinbefore, pursuant to Subtitle III of Title 47 of the Revised Statutes of Louisiana.

62.     LL&E is required by law to file or cause to be filed under oath with Plaintiff Bonvillain true, complete, accurate, and correct tax reporting information pursuant to the LAT12 forms, as hereinbefore alleged.

63.     LL&E, through its authorized agents, submitted under oath LAT12 forms for each of the relevant reporting periods from and after 1998 until 2008, inclusive.

64.     Plaintiffs reasonably relied upon the information submitted under oath by LL&E pursuant to each and every one of the LAT12 forms filed for the relevant reporting periods from and after 1998 until 2008, inclusive, to assess and collect the tax owed by LL&E for the tax reporting periods 1998 through 2008.

65.     Instead of LL&E's reporting the foregoing tax information truthfully and accurately, as it is required by law to do, LL&E instead filed LAT12 forms for the reporting

periods from and after 1998 until 2008 that were false and materially misleading in the following respects:

    a.    The fair market value on a replacement-cost-new-less-depreciation basis of much of the property that was reported by LL&E as being in service was underreported by a substantial amount;

    b.    Substantial amounts, by number and value, of movable property that was eligible for calculation and payment of ad valorem taxes were not reported at all;

    c.    Some wells reported as being shut in were in fact producing minerals, thus the amount and value of movable property that was eligible for calculation and payment of ad valorem taxes with respect to those wells was underreported.

66.    The foregoing underreporting of the value of movable property to Terrebonne Parish by LL&E was done with the intent to deceive Plaintiffs and thus reduce the exposure of LL&E to liability for the lawful payment of ad valorem taxes.

67.    As a direct and proximate result of the foregoing false and materially misleading reporting of its property that was eligible for calculating its liability for the payment of ad valorem taxes to Terrebonne Parish, LL&E underreported its tax liability in an amount to be determined upon a trial of this cause, but it is believed by Plaintiffs at the present time, and subject to further investigation, that the amount is in excess of $950,222.

22

68.     As part of the scheme to avoid the payment of taxes to Terrebonne Parish, LL&E concealed its activities from Plaintiffs.  In light of the adoption of the self-reporting system based on the difficulty of visually inspecting the inshore and offshore property that is the subject of the taxpayer's self-reporting, Plaintiffs did not know and had no way of knowing of the injury suffered by Terrebonne Parish as a result of Defendant's fraudulent conduct until the recent initiation of the VLS Study.

WHEREFORE, Plaintiffs demand that judgment be entered in his favor and against LL&E on Count II and that Plaintiffs be awarded the following:

a.      Compensatory damages in the nature of unpaid taxes that should have been assessed and paid absent Defendant's fraudulent and false underreporting, nonreporting, and false reporting of LL&E's tax liability owed to Plaintiffs, the specific amount of such damages to be proven at trial;

b.      Costs of this action, including a reasonable attorney's fee; and

c.      Such other and further relief as the Court deems just and proper.

Plaintiffs demand that all issues so triable be tried to a jury.

Respectfully submitted,

/s/ Don M. Richard
Don M. Richard, Esquire
Bar Roll No. 11226
Michael H. Ellis, Esquire
Bar Roll No. 5334
Julian R. Murray Jr., Esquire
Bar Roll No. 7526
Chehardy, Sherman, Ellis, Murray et al.
Suite 1100
One Galleria Boulevard
Metairie, LA  70001
Telephone:  (504) 830-4130
E-Mail:  dmr@chehardy.com

Kenneth T. Watkins, Esquire
WATKINS, WALKER & EROCHE
501 Roussell Street
Post Office Box 5095
Houma, LA 70361-5095

Counsel for Plaintiffs

Ron Kurzman, Of Counsel
3rd Floor
1200 Avenue Of Americas
New York, NY 10036

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 8, 2010, I electronically filed the foregoing

with the Clerk of Court by using the CM/ECF system which will send a notice of electronic

filing to all counsel of record for all other parties.

/s/ Don M. Richard